Opinion issued April 16, 2024



In The

# Court of Appeals

For The

# First District of Texas

———————————

NO. 01-22-00335-CR

NO. 01-22-00336-CR

———————————

**CLIFFORD MILTON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 337th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1612515 and 1612516**

---

## OPINION

Appellant Clifford Milton was indicted on two counts of trafficking of a child by prohibited conduct. In Cause Number 1612515, he was indicted for the offense of trafficking of a child by causing the complainant to become the victim

of sexual assault, and in Cause Number 1612516, he was indicted for the offense of trafficking of a child by causing the complainant to become the victim of prostitution. The charges were enhanced with a prior felony conviction for the offense of theft. The jury found Milton guilty of both counts and the trial court sentenced Milton to twenty-eight years in prison for each conviction.

In three issues, Milton argues (1) there was legally insufficient evidence to prove he committed the offense of trafficking a person in Cause Number 1612516 because he did not cause the complainant to commit prostitution, (2) the trial court abused its discretion in allowing the admission of extraneous offense testimony, and (3) the judgments should be modified to reflect (a) a finding on the enhancement paragraphs of "N/A" instead of "pleaded true" and "found true," and (b) to state the sentences are to run concurrently.

We affirm the trial court's judgment as reformed.

**Background**

Milton was charged by indictment with two separate offenses. The first indictment, filed in Cause Number 1612515, alleges that on or about September 20, 2018, Milton "knowingly transported[ed] [Jane],[1] a person younger than 18 years of age" and caused Jane to become the victim of a sexual assault. *See* TEX.

---

[1] We use pseudonyms to protect the identity of the complainant. We refer to the complainant as "Jane" and to her father as "Father."

2

PENAL CODE §§ 20A.02(7)(C), 22.011.[2]  The second indictment, filed in Cause

Number 1612516, alleges that on or about November 3, 2019, Milton "knowingly

transported[ed] [Jane], a person younger than 18 years of age" and caused her to

engage in prostitution.  *See* TEX. PENAL CODE §§ 20A.02(7)(H), 43.05(a)(2).  The

charges were enhanced with a prior felony conviction for the offense of theft.

Milton pled not guilty to each charge.  A jury convicted Milton of both offenses

and the trial court sentenced him to twenty-eight years in prison for each count.

**The Trial**

The State presented eleven witnesses during the guilt-innocence phase of

trial.

**A.     Father**

Father has two children, Jane and her brother.  Father testified that Jane was

"very intelligent, quiet, like[d] to go out a lot, go to eat, go fishing, liked to go on

vacation."  Jane and Father were close and she had a "great relationship" with her

brother.

In 2018, Jane ran away.[3]  She was fifteen years old.  She left a letter stating

she "honestly cannot live in this house no more.  I just don't like it."  Jane wrote

that by the time her family read the letter, she would be on her way to Austin or

---

[2]     Unless otherwise indicated, all references to the Texas Penal Code are to the
statutes as they existed when the alleged offenses were committed.

[3]     Father testified Jane ran away on September 18, 2018.  The letter Jane left behind
for her family is dated September 19, 2018.

3

Dallas, and that if she got a job, she would send money to the family. Jane wrote that "going to school, getting screamed at and all this stress" wasn't for her. She said she would "be okay" and would not "end up dead." She continued, "So let me propose my deal to you. I go to school, make money, and send you-all money, and live somewhere else. I promise I'll be good. But if it doesn't work out, I'll come home and I'll let you take me to juvie. That's my deal. I know it's kind of risky, but it's worth a try."

When Father found Jane's letter, he filed a police report and started looking for Jane on her social media. Father also talked to Jane's friends and classmates, and he drove around every day. At first no one claimed to know anything about Jane's whereabouts, but after a while, some kids gave Father "some information where she could be." Father went to places "where there [was] more prostitution because people gave [him] ideas where [Jane] could be; and they were not wrong." He testified that he "started looking for [Jane] in the areas where there was more prostitution because [he] had the feeling that . . . she had been kidnapped or something." Father prepared a "missing" poster and his cousin found Jane's photo on a website "where she was being sold as a prostitute."

Father found some of Jane's social media posts. Some of them were ads that included her "prices" and the pictures in some ads led Father to one of the hotels where Jane was staying. Father recognized a furniture store in some of the ads and

found a nearby "America's Best Value Hotel" where the photos in the ad were taken. He went to the hotel and called the police to meet him there but when they arrived, Jane was not at the hotel.

Father continued to look for Jane at various hotels and created an account on a dating app called "SKOUT" to look for her. One of his cousins found Jane's ad on an escort website named "Erotic Monkey." The ad said "Escort, massage," and above that, it said "Houston escort, 18-24, Latina." The ad provided a phone number and described Jane's body. Father's nephew called the listed phone number to set up a date with Jane, and Father went to a Motel 6 where the date was scheduled. Father called the police from the Motel 6 and the police arrived. They knocked on the motel door, but the room was quiet. They called out for Jane, but there was no response. The police did not have a warrant and did not break the door down. Father stayed for another thirty minutes and then went home. He believed Jane was in the room, so he returned to the hotel the next day. By the time Father returned, whoever had been in the motel room was gone.

Father testified that Jane's ads referred to her by another name and age. One said she was nineteen and used the name "Alaina" and another said, "Houston escort, 18-24." Jane was still fifteen at the time. The first ad said, "hmu for serious inquiries only."[4] The photos in the ad looked like selfies. Father did not

---

[4]    "HMU" stands for "hit me up."

know who uploaded the photos or what phone they were uploaded from. The phone number on the second ad was the number Father's nephew called, but Father did not know who answered the phone, whose phone was called, or where the phone was answered.

A week to ten days after Father looked for Jane at the motel, Jane was recovered. One of the detectives called Father to let him know. Jane was taken to Texas Children's Hospital and Father and other family members met her there. Jane looked skinny and as if she had not slept in a long time. When Jane saw her Father, "She [ran] to me and she hugged me and cried and squeezed me, and I did the same thing." Father testified, "She was happy to see us for sure." Jane hugged her mother and brother and was taken to the hospital to be examined.

Father testified that since Jane returned home, she has not run away again. He stated, "She wanted to do everything right this time and she knew what she did was wrong. I think she became more mature. She wanted to study more. She wanted to be more involved with everybody[.]"

## B.     David Riggs

Sergeant David Riggs of the Houston Police Department's ("HPD") Human Trafficking Division was assigned to Jane's missing person case, which was identified as possibly having a human trafficking aspect. He identified several websites, including Erotic Monkey, that are known for publishing escort

6

advertisements. He testified about an ad with Jane's photo that referred to nineteen-year-old "Alaina" and contained the language "hmu for serious inquiries only." Sergeant Riggs testified that the language "hit me up for serious inquiries only" is consistent with language he has seen in escort adds. He said the ad was "propositioning for something" and that the photo was consistent with what he has seen in escort advertisements. It contained "terms [] that would indicate that they're advertising for sex."

Sergeant Riggs testified that juvenile human trafficking victims usually come from broken homes, or CPS custody, but in some cases, they are girls from good homes who "feel like they might need more freedom or they need to get out of the house or something like that." He testified the most prevalent way of attracting victims is through social media, which "plays a very big role." Traffickers attract victims either by "asking to date them" or by "sending them pictures of going to parties or videos of going to parties and having money and nice cars and trying to persuade them that way." He testified there are several techniques traffickers use to keep the victims from returning home, such as using force, pretending to fall in love with the victim, getting the victim addicted to drugs, threatening to kill someone close to the victim, or isolating the victim, taking her cell phone and telling her that her family does not want her back.

Sergeant Riggs testified that when investigating human trafficking, HPD and other law enforcement agencies use a search engine called "Traffic Jam" to search for ads using certain phone numbers, or by using facial recognition to find victims. Traffic Jam is a tool that helps generate leads and develop trafficking cases.

Using a phone number he located through Traffic Jam, Sergeant Riggs located multiple ads involving a girl he later learned was Jane. When he ran the search, he did not know what Jane looked like but was simply searching a phone number. That phone number led to another phone number and additional ads. Phone records were introduced into evidence that indicated Milton had one of the phone numbers that turned up on Traffic Jam. The phone number listed on at least two ads with Jane's photo belonged to Milton in October and November 2018. Sergeant Riggs also used a search engine called Whooster as a "lead-generating" tool. Whooster was developed to collect data from phone numbers. Whooster also indicated Milton was linked to a phone number on some of Jane's ads.

## C. Officer Nadeem Aslam

Officer Nadeem Aslam is an HPD patrolman. He was working the night shift on November 5, 2018. He was dispatched to a call at a Motel 6 at 2900 West Sam Houston Parkway at 11:30 p.m. regarding a missing person. He testified the hotel has a reputation for "drugs, sex trafficking, and prostitution." Officer Aslam understood from the dispatch that Father had located his daughter, who had been

missing, at that hotel. Officer Aslam met Father at a nearby gas station to get more details. Officer Aslam then spoke to the hotel front desk clerk and manager. They were told the room where Father believed Jane was staying was occupied.

Father and several officers went to the room. Officer Aslam and his partner went to the door and knocked. They heard male and female voices. Officer Aslam put his ear to the hotel room door and listened for a moment and then knocked and said, "HPD." After they knocked, the manager tried to open the door with a key, but the door was locked from the inside. Officer Aslam did not hear any arguments or screams inside the room. They waited outside the room twenty-five to thirty minutes see if anyone approached or left the room. There was no probable cause to break the door down. They never saw Milton or anyone else in the room. The officers did not see Milton on the property that night.

### D.     Officer Brad Bourgeois

HPD Officer Brad Bourgeois worked in the vice division in 2018. On November 7, 2018, he was working the night shift conducting an undercover operation called "Out-Call" where the girl comes to the john.[5] He testified that the purpose of the investigation was to target escort websites. "We put an emphasis on trying to go through the ads and trying to find the youngest-looking girls we could find because human trafficking exists on these [w]ebsites. And we found that if we

---

[5]     A "john" is a person who pays for sex.

could possibly find and get a younger girl that was working on these [w]ebsites that possibly it could be related to a bigger and more complex investigation than just a normal prostitution investigation." According to Officer Bourgeois, the vice division seeks "to stop prostitution and to rescue girls who are in need of rescuing."

As an undercover officer in an "Out-Call" operation, Officer Bourgeois connects with someone in an ad on an escort website. He does so by text message or phone call or both. On November 7, 2018, he came across an ad on Listcrawler.com, an escort website, and he contacted the number on the ad. The ad had a photo of a female in "[underwear] and tank top posing on a bed." He said the age listed in an escort ad is "hardly ever accurate" because "[m]ost of the girls in those ads either want to be older or want to be younger."

After calling the number in the ad, Officer Bourgeois spoke with "Alaina" and once they agreed she would come to him, they began text messaging. He used his undercover name, "Josh." They were to meet in room 439 at the Hyatt Regency located on 425 North Sam Houston Freeway. At first when "Alaina" arrived, they made small talk. The talk then turned sexual in nature, and they made an agreement for straight sex for $150.[6, 7] The hotel room had an adjoining room with a door that led to another room where the surveillance team was located.

---

[6]      Phone records indicate the agreement was for $250.

10

After the agreement was made, Officer Bourgeois opened the door where the arrest team was waiting. They came in and took the girl into custody. The arresting officers were wearing clearly marked HPD jackets and uniforms. "Alaina" appeared "relieved" and "thanked [them] immediately, which was very uncommon." Officer Bourgeois identified "Alaina" as Jane.

The officers interviewed Jane and she told them her story. She was receiving cell phone calls while they spoke. She told the police she arrived in at the hotel in a black Chevy Camaro. The officers went downstairs to the parking lot and stopped a Camaro matching that description. At that same time, Jane called the number that had been texting her and the phone that was in the Camaro rang. Henny Baham, Ronald Calloway, and an unidentified female were in the Camaro. Baham is Milton's cousin, and Calloway is Milton's brother. The ringing phone was recovered from Baham, who with Calloway had driven Jane to the hotel. The other phone was recovered from Jane. Milton was not in the Camaro or at the Hyatt at that time. Officer Bourgeois obtained search warrants for the cell phone that rang in the Camaro and the cell phone in Jane's possession when they found her. He testified that he had been communicating with Jane through one of the cell phones to arrange the date. Baham was arrested the day they found Jane.

---

7       The conversation between Officer Bourgeois and "Alaina" was recorded and played for the jury.

11

Officer Bourgeois did not know who posted the ad he answered, how long it was posted, who took the photos, how old the photos were, or from where the ad was posted. He did not know who was texting him after the initial voice call.

After the police interviewed Jane, she was taken to Texas Children's Hospital for a physical examination.

## E. Officer Ryan Bearden

HPD Officer Ryan Bearden works in the Financial Crimes Division. In 2018, he was a patrol officer. He received a "wagon call" on November 7, 2018 at 11:08 p.m., which is typically when an individual is in custody and needs to be taken to jail. He was told to report to a Hyatt Regency Hotel at 425 North Sam Houston Parkway. The officers were interested in a black Chevrolet Camaro, which Officer Bearden spotted when he arrived at the hotel. He saw officers interacting with the people in the Camaro when he approached. Officer Bearden found Baham, Calloway, and one female in the car.[8] As Baham, the driver, got out of the car, a phone fell from his lap. Officer Bearden put Baham in the back of his patrol car and the Camaro was released to Calloway.

Jane was taken to Texas Children's Hospital.

---

[8] Officer Bearden did not recall the name of the female passenger or what happened to her when Baham was taken into custody.

## F.     Mercedes Collins

Mercedes Collins is a nurse in the Texas Children's Hospital emergency room.  She is a SANE nurse, or a "sexual assault nurse examiner."  She testified that she examined Jane on November 8, 2018.  Jane, who was sixteen during the examination, told Collins she was first sexually assaulted about seven weeks before arriving at the hospital.  Jane told her she was sexually assaulted multiple times during that period, the last time being the day before her examination.

According to her medical history, Jane told Collins "she ran away seven weeks ago with a man she met on an app."  The app was called SKOUT.  "He said if I did everything he wanted, I would get everything I want.  When I first got there, it was cool; but then after a few days, he said he was going to pimp me out.  At first it was fine, but then I wanted to leave because he was taking all the money that I was making."

Jane told Collins the man was "Clifford Milton."  Jane told her the last time he pimped her out was that day.  Jane estimated to Collins that she had sex with sixty to eighty people when she was with Milton but then revised her estimate to "probably below 60."  All but two or three of the men wore condoms and for those who did not, she "took the Plan B after."  The police found Jane during an undercover operation after Jane was taken to a hotel for a date.  There, Jane

knocked on the hotel room door. After she entered the room and spoke with the man inside, "the cops came in. I told them to take me. I just wanted to go."

Collins testified that the information Jane provided was consistent with trafficking. Jane manifested no physical injuries during the exam, although she complained of lower abdominal pain, and she tested positive for chlamydia.

Collins was asked about Jane's medical records with respect to her mental health and emotional behavioral history, which Collins reviewed but did not prepare. The records state, "Patient is a frequent runaway, and this is the second time she has been a victim of sex trafficking." "Patient stated that she ran away because her parents sometimes yell at her and that her parents do not give her the attention that she wants." The records further state that "Patient reported that on the third day with [Milton], [Milton] told patient he was going to pimp me out. Patient said that she was willing to try it." The records continue: "Patient reported that after a while she realized that all the money I'm making, he would take." She also said Milton was "too aggressive." She explained that "one time he was going to hit me with a cord. He wanted to but I think he realized I was 16, so he didn't." "Patient stated that she told [Milton] that she wanted to go home, but [Milton] would not let her leave."

## G. Lisa Holcomb

Lisa Holcomb was a forensic interviewer at the Children's Assessment Center in 2018.[9] Forensic interviewers gather information from children "where there's been an allegation of sexual abuse or a witness to a violent crime[.]" Holcomb had a forensic interview with sixteen-year-old Jane on November 14, 2018.

According to Holcomb, Jane was very detailed during her interview in describing what happened to her. She gave details including locations, times, identities, people involved, and was "very informative." She described multiple sex acts. Jane gave forty-five minutes of narration during the forensic interview and then Holcomb went back and clarified a few things. When she asked follow-up questions, Jane gave consistent details. Jane was very matter-of-fact during the interview. The entire interview lasted two hours and seven minutes.

Holcomb testified that "grooming" behaviors with respect to trafficking victims occur when victims cannot make communication with outside people. The pimps get the victims involved with drugs and other crimes to control them.

## H. Nathan Gates

Nathan Gates is an investigator and forensic examiner with the Harris County District Attorney's office. Gates uses Cellebrite, a cell phone data

---

[9] The Children's Assessment Center is a child advocacy center that serves children who are victims of sexual abuse and sex trafficking and their families.

extraction tool used by state, local, and federal government and law enforcement agencies, to extract and report information that is stored in cell phones and computers.

Among other things, he performed a data extraction in this case involving Jane's test messages with Officer Bourgeois, when they arranged their "date." Gates' data extractions also reflected text exchanges from other phones, including one belonging to Milton, to and about Jane.

## I.      Jane

Jane was nineteen when she testified at trial. She was "nervous and scared" because "this is the first time . . . after three and a half years that I – I talk about this." She lives with her boyfriend and has two jobs, one from 9:00 a.m. to 4:00 p.m. and one from 4:00 p.m. to midnight.

According to Jane, in September 2018, she was fifteen.[10] She was a high school sophomore and was doing well in school. She lived with her parents and her younger brother. Things were not good at home. Her parents were always arguing and did not pay attention to her or her little brother. Jane ran away because of her parents' marital problems. She testified, "[O]nce I started to notice that stuff in the house wasn't how it used to be, I didn't want to be there."

---

[10]     Jane testified that she left home periodically against her parents' wishes but typically returned. Jane first ran away at age eleven. Once, she was gone a week.

16

She met Milton, who she knew as Rico, on SKOUT, an adult dating app. On SKOUT, she created a fake email and a fake name and said she was nineteen. She had not used SKOUT before. SKOUT is "supposed to be a dating app, but that's where everybody gets on there and it's a lot of—it's basically like Instagram, but it's more like adult-ish. You know, it's only for 18-year-olds, but I was 15." Jane indicated that she was nineteen on her profile on the app.

She began to text with Milton. According to Jane, they texted for less than a day before she decided to leave home. She did not know at first whom she was communicating with on SKOUT. She did not know his name, just a nickname, which was "Rico." She later found out his real name was Clifford Milton. When they were communicating on the SKOUT app, "At first he just hit me up. It was, like, Hey. And then it went, like pretty straightforward. He just said, 'We can make money. I can give you money. We can do this. We can do that. You can do anything you want. I'll feed you. I'll get you the clothes you need. I'll get your nails done, anything you need.'" Jane testified, "I was promised money, that I was going to get my nails done, get clothes, all the stuff that a girl wants." She understood that he was offering a "[a] job. I was 15. That's the only way I thought of it. I thought it was just going to be a job."

She left a letter for her parents when she ran away. She told her parents in the letter that if she got a job, she would send them money. Jane left home six days before her sixteenth birthday.

Jane did not recall where Milton picked her up, but it was not at home or school because she did not want him to know where she lived. "He came to pick me up[,] and once he picked me up he took me to go get food and then he went to go get some weed for me to smoke." Milton was with his brother, Ronald Calloway, who they called "Ro." She took a duffle bag of clothes, a backpack, and a personal bag when Milton and Calloway picked her up. She packed half of her clothes, because she figured she would be gone for a while.

The first few days she was with Milton and Ro, Milton "brought me food and he brought me weed." In those early days, "there wasn't nothing going on. It was just—it was just promises. Just promises, promises. If I'm hungry, I could tell him and he would get me something to eat. If I need something, just to let him know and he would give it to me. Like, I just thought I was being spoiled."

In addition to getting her food, they were just riding around. At first, she thought Rico was "cool." She testified, "He was being nice. He was buying me food, make sure I ate. Asking me every two hours was I hungry and—like, that's how he was at first." But a few days later, it was understood "that he wanted me to

18

do stuff with other men for money. So he would give me the phone and tell me to text all these johns while he was there[.]"

Then Milton assaulted Jane. "[H]e just came in the room and he asked where the condoms were." He went to get a condom and "he had sex with me . . ." Jane testified Milton put his penis inside her vagina while she "was laying down on the bed turned around." "[A]fter awhile he just stopped. I didn't even turn around. He just went to the bathroom, and I just laid there."

Jane testified, "[O]nce he started putting up his money and he realized that I needed to make some money. That's when everything changed." He started "telling me to take sexy pictures, making sure I got revealing clothes, making sure I showed my body more often, and texting guys." At first when he told her she was going to have to make money, she thought it was a job. But then she understood she could not get a job at her age, "so he just told me to take sexy pictures." "[O]nce I figured out that I was taking pictures like that, I didn't like it; but I didn't want to argue with him because I didn't know if he would do something to me." Jane had to take "pictures of my breasts, pictures of my vagina, pictures of my arch. I would have to send it to him or send them to the johns, so that way they could came to me and get what they wanted."

Sometimes she took the photos herself and sometimes Milton and Calloway took them. That began in the first hotel. She does not know how long she stayed

19

at that hotel. She understood the reason for the photos once people started coming to the hotel. "[J]ohns would come after I had the pictures taken." According to Jane, Milton or she would tell the johns to come to the hotel. Milton gave Jane a phone to use but she could only use it when he was around, or if he was not around, he would check the phone later. She could have contacted her family "but I did not want to put my parents in that situation. Once that I realized that everything wasn't how it was supposed to be, I wanted to, like, keep my family out of it as much as I could because I knew they were already stressed and upset and all types of hurt when I left. So who – who was I to call and be, like, hey, Dad, can you come and pick me up at this hotel? And I'm just half naked. I didn't want my dad to look at me like that. I didn't want him to be disappointed in me."

Jane testified that some of the men who came to the hotel room were "aggressive." Some of them "just treated me like I wasn't nothing." She asked one john for help "because I didn't want to be there no more. I wanted to go home." Before the men arrived at the hotel room, "it was already, like, planned. So before they would come in the hotel room, it's like they already knew what they came there to do. And what I mean by that is, like, they knew that they were coming in there to have pay to have sex with me." At the first hotel, Jane testified she would have sex with one to three men if she was not making much money that day but if she was making money, it was seven or eight men in one day.

20

Milton would tell Jane how much money he told the johns to pay, "so I would be expecting that amount of money for that amount of time." The johns would text after seeing an ad posted of Jane. They would get the phone number from the ad and then text the phone and disclose how much time they wanted to spend with Jane and she would tell them the price. "[T]he more time it was, the more money it was; I would have to be there for that amount of time or until they ejaculated." She always gave the money the johns paid to Milton. Milton paid for the hotel rooms.

At the second hotel, Jane started to see Milton's and Calloway's friends and relatives. She continued to have sex dates with strangers at that second hotel. Milton either used new photos that he or Jane took, or he used photos already on the website and the men would text or call and ask about Jane's rates and availability. When the men texted, Milton would tell Jane how to respond or he would respond. When the johns called, Milton gave her the phone so they could hear her voice.

According to Jane, "Once we agreed on a price and a time, the address was sent and they would be on the way to the hotel, depending how far they are. And then once they got closer, we would text message, saying: Let me know when you're five minutes away so I can get ready. But, in reality, when they were five minutes away, [Milton] would leave the room and he would be outside. He would

21

leave the room, but he would know and see when the person would go in the room."

Jane would do whatever sort of sex acts the men wanted. "They would ask for oral. They wanted to do anal. At times, they didn't want to use a condom. They just wanted to cum in me; but I can't let them do none of that because if I do, it was supposed to be more money if they wanted to do that." "When they had sex with me, they would always use a condom. That's how the rule was. Like, you can pay for the time, pay what you want, but then you have to use a condom. And if they didn't, they would have to pay more."

Jane testified that she did not think about calling the police when she had the phone. "I did think about calling my parents because that's the only people I wanted to go back home to. Everything that was happening to me, I realized that it wasn't worth it, that I should have just stayed home, that I would have to be in that position where I was debating if I should call my parents for help. I knew that they would always help me, but I didn't want them to be hurt. . . . I wanted them to be safe." She said she wanted to go home but "I just didn't know how to do it."

At the second hotel, Jane testified she had sex with up to seven people a day. She gave all the money she made to Milton. "[H]e told me that if I was hungry or if I needed something to let him know. He would buy me food at first. When I was making the money, he would buy me food. He would ask me what I wanted to

22

eat and this and that and I would tell him; but once I stopped making money, he didn't want to give me nothing no more."

Jane testified that she used the name "Alaina." The ads indicated she was nineteen, but she was actually fifteen or sixteen. On her sixteenth birthday on September 25, 2018, she was still with Milton. She was "still being with johns, with guys who were paying me to have sex. I knew it was my birthday; but considering the situation that I was in, I didn't feel like nobody cared. I didn't want to celebrate my birthday with them either. I kept it to myself just the whole day of just thinking about what I could have done on my birthday."

Milton drove Jane to a third hotel. "At that point, he liked that I was making money so he wanted me to recruit other girls." "I had to get other girls—get other girls to do the same thing that I was doing." She reached out to other girls because Milton thought girls would be more comfortable if she contacted them than if he did. He wanted additional girls involved because "[h]e wanted to make more money." According to Jane, she would "get on the SKOUT app, the one I was [initially] on, and look for girls and promise them the things that he promised me . . . . Telling them if they come with me, they would get their nails done and they can have as much money as they want for food and clothes." "All the girls were older, so they told me no. But one girl told me yes[.]"

The girl met with Jane in Alief. Jane was with Milton. The girl ("Marcy")[11] brought a duffel bag with her clothes and her make-up. Jane testified that when she first saw Marcy, "I looked at her SKOUT picture. She looked young; but when I looked at her, I knew she was a kid. Like, everything I saw was telling me that she was a kid. And I could tell that she was younger than me." Jane thought Marcy was fourteen or fifteen.

Milton drove Jane and Marcy to a hotel and paid for the room. This was at the end of October, about a month and a half after Jane left home. "He told me to take pictures, dress her up." The photos Milton wanted were of the girls' bodies. Jane gave Marcy clothes, took photos of Marcy with Milton's phone, gave her condoms, and posted the ad online per Milton's instructions. The ad was posted on November 1, 2018.

Jane testified she "looked at [Marcy] and I seen that—I could tell that she was young. I just wanted to get her out of there" because "I was going through it and I didn't like the situation I was going through. I didn't like nothing. I didn't want to put her in that position where she knew she wanted to go home that day or the next day or whatever the case was. I just wanted her to be safe. I really wanted her to go home."

---

[11] To protect her identity, we use "Marcy" as a pseudonym for this witness.

24

Jane explained that if a girl does not make money, "then they just drop the girl off anywhere. It doesn't matter if they're from there or not. So the only thing I could do was to get [Marcy] some money. The only way to get her money was for her to be with somebody else in a sexual way; and once I got her the money, I had to split it between her and Ronald," Milton's brother.

Jane testified one man responded to the ad she posted with Marcy's photo. Jane and the man communicated through texts. According to Jane, the man who came to the hotel for Marcy looked like he was in his 30s or 40s. He went into the hotel room with Marcy while Jane waited outside the room. Marcy and the man had sex and money was exchanged. When it was over, Marcy came out. She had $70 from the john. Jane gave Marcy half the money and the other half to Calloway.

Calloway and a girl Jane had never seen before picked up Jane and Marcy in the morning and dropped Marcy off at school. Jane did not see Marcy after that. Jane testified that it was the only time Marcy worked for Milton. Calloway took Jane and the other girl to another hotel.

Jane testified that by that time, "I was dead inside. Like, I had so much weed and pills in my system, I felt like I was dead. Like, at that point, I was just letting them do whatever they want to me. I just felt like I wasn't human. I just felt like trash." She stayed at that hotel just one day.

After that, Jane testified they went to a Motel 6 nearby. She was there with Milton, Calloway, Baham, and someone she did not know. Milton paid for the room. Jane estimated that she had twenty or twenty-five dates at the Motel 6, all sex acts in exchange for money, which she gave to Milton. Asked to define "sex acts," she said, "They would tell me what they want. . . . [T]hey would tell me the position they wanted me to be in so I would get in that position and I would give them the condom." She testified, "It got to a point that I didn't want to do it, so I started blocking their numbers." Milton did not know she was doing that.

According to Jane, she did not reach out to her parents when she had the phone because she "just gave up." "I really did give up on myself. I just felt like my parents would have been better off without me. . . . I wanted to go home but I didn't—I didn't want them to see me like that. I didn't want to be a disappointment."

Calloway and Milton took photos of Jane and a girl named Makia "because they were posting us together again because they were trying to make money since money was getting low for them." The police showed up at the hotel room they were in. Milton told Jane to "put the phone in the water, flush the weed." Jane did not let the police know she was there because she was scared that Milton would do something to her. After the police left, everyone "scattered." Jane, who used a ride-share service, went to a fast-food restaurant and Makia picked her up there.

Jane testified she went to Dallas with Milton, Calloway, and Baham because Milton and the others thought there were too many police looking for them in Houston. In Dallas, they checked into another Motel 6. She did not have any dates with men there, but Milton posted an ad on November 7, 2018. They stayed in Dallas only one night.

Meanwhile, Milton became mad because Jane did not want to make any money. "I didn't want to do anything anymore. It was just so drugged. But . . . the more sober I got, I didn't want to be there. . . . He wanted to give me pills to stay up and I denied him and he got mad at that. . . . I did end up falling asleep. And he was getting mad that I was going to sleep and not making him money." Milton passed Jane off to Baham in Dallas because Milton "[knew] I wasn't going to get no money. So [Baham] didn't have a girl so [Baham] was just, like, I'm going to keep her. Let me get money off of her." When Jane returned to Houston, Baham took her to an InTown Suites. She worked for Baham only one day before she was recovered. At all other times, she worked for Milton.

Jane testified that when she got back to Houston, she "wanted to go home. I was hurting. My body was hurting. I was in the bathtub, and there was blood. I just wanted to go home. Like, my body was so drained. I was hungry. I was tired. I just wanted to go home." She had a date at the InTown Suites where the john was hurting her. "I told him that he was hurting me and he wouldn't stop. And

27

then after awhile, it was like—while he was hurting me, I started bleeding while he was doing it. And I told him I was bleeding, and he didn't stop. And so he came, and that was that."

Her next and final date was at a Hyatt Regency hotel with a john named "Josh." She went to the john's room and when she was about to undress, he opened to door to the adjoining room and law enforcement authorities entered. When Jane saw the police, she "felt happy. I told them to take me. I was just like, take me. Take me now." The police saw she was hungry and sleepy and one of the agents went to get her food. They took her to the hospital, where her parents and aunt were waiting for her. She testified, "I felt happy. I was happy to go back home. I apologized to my dad and my mom."

## J.    Marcy

Marcy was seventeen when she testified. In October 2018, she was thirteen years old and lived with her mother. That month, she ran away because she met Jane on an app called "Meetme," an adult dating site. One day, Jane asked her if she would like to meet and Marcy said yes. Marcy did not know what they would be doing but she assumed they were "just going to hang out." Marcy put on her "Meetme" profile that she was eighteen years old.

Marcy, who was supposed to be spending Halloween night at a friend's house, snuck out of the house when the friend's parents were asleep. Marcy told

28

the friend she was going to another friend's house. Instead, Jane and Milton picked Marcy up. Marcy, who did not go by her real name with Jane and Milton,[12] had not met Milton before. Marcy expected to be gone "maybe a day. Yeah, a day." She was "nervous" because she "wasn't expecting [Milton] to be with [Jane]. When I got in the car, she told me it was just a friend of hers." Milton and Jane took her to an InTown Suites hotel in Greenspoint. When they got to the hotel, Milton came into the room but then he left and she did not see him after that. Marcy testified that she believed Milton paid for the room.

After Milton left, Jane had Marcy pose for photos in lingerie that Jane gave her. Marcy did not know why she was doing it, but she was nervous. She testified that after Jane took the photos, she uploaded them to a sex website. The photos were posted on November 1, 2018. After the ad was posted, a man who appeared to be in his late 30s came to the door. Marcy said, "He was trying to pay for sex," having seen the ad that was posted of the two girls. When he came to the hotel, Jane left the room and Marcy was alone with the man. "We had sex, and he gave me money after." According to Marcy, Jane "told me the prices, like what to charge. He knew that he had to pay."

---

[12]   Marcy testified she had not used her real name because, "I was really just scared and nervous. I didn't really know what's what would happen. I didn't know, like, the outcome or anything."

29

After the man paid Marcy, the man left, and Jane returned to the room. Marcy gave the money to Jane. Early in the morning, Jane and Marcy were picked up by Calloway. Jane was dropped off at another hotel and Marcy was dropped off by her school. Marcy did not see Milton again until she testified at trial.

**K.     Dr. Nneka Nnadozie**

Dr. Nneka Nnadozie is a staff psychologist at the Children's Assessment Center. She conducts psychological evaluations and provides individual, family, and group therapy to children who are victims of sexual abuse and sex trafficking. She testified that she has spoken with approximately 150 children who are victims of sexual abuse. Among other things, she provides psychotherapy to sex trafficking victims. She did not meet with Jane but watched her testimony in court. Dr. Nnadozie's knowledge of Jane is based on Jane's testimony during trial and the Children's Assessment Center video of Jane's forensic interview that Dr. Nnadozie watched.

Dr. Nnadozie testified that children who are "more vulnerable" are likely targeted for sex trafficking. Those may be children with mental health issues, substance abuse issues, neglectful homes, low IQs, or a history of sexual, physical, or emotional abuse. She said traffickers are typically male, older than the victim. The trafficker is usually in control, "has all the power and leads to victim to be dependent upon them, dependent for basic needs such as food, water, sleeping."

30

Dr. Nnadozie described different types of relationships pimps have with the trafficked victims. She said in the beginning of Jane's relationship with Milton, there was "grooming," which is "what the abuser or the pimp does to get the victim ready to be abused or exploited." She said there are stages to grooming: targeting the victim, looking for vulnerable girls who want attention and to be loved; gaining the victim's trust; and meeting the victim's needs—for food and shelter and for luxuries such as getting her hair and nails done. After meeting the need, the victim is isolated and her line of communication with friends and family is cut off. After isolation, the victim is exploited.

Dr. Nnadozie heard testimony about Milton trying to gain Jane's trust and isolating her. She testified that Jane "didn't have a home. She didn't have a way of communicating with anyone." She also heard testimony about Jane's exploitation through the posting of ads.

Dr. Nnadozie testified that sometimes trafficking victims stay with a pimp even if there are opportunities to escape because they don't believe they can leave. They believe they are being watched and the victim wants to protect her family from the pimp. The testimony Dr. Nnadozie watched led her to believe that Jane did not leave because she feared for the safety of her family. Dr. Nnadozie testified that Jane's testimony that she was helpless and could not remove herself from the situation was consistent with a victim of sex trafficking. Dr. Nnadozie

31

said it is not easy for a sex trafficking victim to run away from the trafficker. "Sometimes they don't have the resources. Sometimes they don't know where to go. Sometimes they just don't have the physical energy. If you're not eating, you're not sleeping and you're high, what energy do you have to walk out of the door or even think clearly about who to call or where to go?"

She testified that sometimes sex trafficking victims take part in victimizing others. This can happen because they are "just doing what they're told. They haven't eaten in days. They haven't had any fluids. They haven't slept. They've probably been getting high and taking drugs. So they're just doing what they're told." Other times, they recruit new victims "to take some of the pressure and abuse off of themselves."

## Verdict and Punishment

No defense witnesses were called during the guilt-innocence phase of trial. The jury found Milton guilty of two counts of trafficking of a child. The trial court sentenced him to twenty-eight years' confinement for each conviction and ordered the sentences to run concurrently.

This appeal ensued.

## Discussion

Milton raises three issues on appeal. In his first issue, Milton requests we modify his judgments of conviction (a) to reflect a finding on the enhancement

32

paragraphs of "N/A" instead of "pleaded true" and "found true," and (b) to state that the sentences are to run concurrently. In his second and third issues, he argues the evidence is legally insufficient to prove he committed the offense of compelling prostitution and trafficking a person based on compelling prostitution in Cause Number 1612516 because he did not cause Jane to commit prostitution, and that the trial court abused its discretion in allowing the admission of extraneous-offense testimony concerning Marcy.

## Legal Sufficiency Challenge

### A. Standard of Review and Applicable Law

#### 1. Legal Sufficiency

Our legal sufficiency analysis has two steps. First, we consider whether "'the essential elements of the crime' for which the prosecution must provide sufficient evidence" support a conviction. *Clinton v. State*, 354 S.W.3d 795, 799 (Tex. Crim. App. 2011) (citing *Geick v. State*, 349 S.W.3d 542, 545 (Tex. Crim. App. 2011)). Second, we examine the evidence in the record "in the light most favorable to [the] verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

The legal sufficiency review "turns on the meaning of the statute under which the defendant has been prosecuted." *Liverman v. State*, 470 S.W.3d 831, 836 (Tex. Crim. App. 2015). The determination of whether certain conduct

33

actually constitutes an offense under a statute, like all statutory construction questions, is a question of law, which we review *de novo*. *Id.*

In construing a statute, "we give effect to the plain meaning of its language, unless the statute is ambiguous[13] or the plain meaning would lead to absurd results that the legislature could not have possibly intended." *Id.* (citing *Yazdchi v. State*, 428 S.W.3d 831, 837–38 (Tex. Crim. App. 2014)) (footnote added). In ascertaining the statute's plain meaning, we consider the rules of grammar and usage and presume every word in the statute has a purpose and that "each word, clause, and sentence should be given effect if reasonably possible." *Id.* (citing *Yazdchi*, 428 S.W.3d at 837). If after using the tools of construction, we determine the statute's language is ambiguous, we may look to extratextual factors to determine the statute's meaning. *Id.* (citing *Yazdchi*, 428 S.W.3d at 838). Extratextual factors include but are not limited to "(1) the object sought to be attained, (2) the circumstances under which the statute was enacted, (3) the legislative history, (4) common law or former statutory provisions, including laws on the same or similar subjects, (5) the consequences of a particular construction, (6) administrative construction of the statute, and (7) the title (caption), preamble,

---

[13] A statute is ambiguous "when the statutory language may be understood by reasonably well-informed persons in two or more different senses[.]" *Yazdchi v. State*, 428 S.W.3d 831, 838 (Tex. Crim. App. 2014).

and emergency provision." *Chase v. State*, 448 S.W.3d 6, 11 (Tex. Crim. App. 2014)).

After engaging in a statutory review, we apply the legal sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979) to determine whether the evidence is sufficient to support each element of a criminal offense for which the State bears the burden to prove beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). "[W]e view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 895). We consider both direct and circumstantial evidence in our analysis. *Laster v. State*, 275 S.W.3d 512, 517–18 (Tex. Crim. App. 2009) (citing *Burden v. State*, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001)); *see Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010) ("Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "the standard of review on appeal is the same for both direct and circumstantial evidence cases.") (quoting *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

While we defer to the factfinder's credibility and weight determinations, the legal sufficiency standard allows the reviewing court to "determine whether the

necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We must presume the fact finder resolved any evidentiary conflicts in favor of the verdict and we defer to that resolution. *Murray*, 457 S.W.3d at 448-49; *see also Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "is restricted to guarding against the rare occurrence when a fact finder does not act rationally") (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010)). If our review reveals the evidence is legally insufficient, we must reverse the appellant's conviction. *Costilla v. State*, 650 S.W.3d 201, 212 (Tex. App.—Houston [1st Dist.] 2021, no pet.). But if there are two permissible views of the evidence, "the fact finder's choice between them cannot be clearly erroneous." *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)).

### 2. Trafficking of a Child

Milton was convicted in Cause Number 1612515 of compelling prostitution and trafficking of a child by compelling prostitution. The indictment states that Milton, on or about November 3, 2018, "did then and there unlawfully, knowingly transport [Jane], a person younger than 18 years of age" and "did cause [Jane] to

36

become the victim of conduct prohibited by Section 43.05 of the Texas Penal Code."

Section 43.05 of the Texas Penal Code is the "Compelling Prostitution" statute. At the time of the alleged offense, Subsection (a)(2) of the statute provided that "a person commits an offense if the person knowingly . . . causes by any means a child younger than 18 years to commit prostitution, regardless of whether the actor knows the age of the child at the time of the offense." TEX. PENAL CODE § 43.05(a)(2). Section 43.02(a) defines "prostitution" as "knowingly offer[ing] or agree[ing] to receive a fee from another to engage in sexual conduct." *Id.* § 43.02(a).

Section 20A.02 of the Texas Penal Code is the "Trafficking of Persons" statute. At the time of the alleged offense, Subsection (a)(7)(H) provided that "a person commits an offense if the person knowingly . . . traffics a child and by any means causes the trafficked child to engage in, or become the victim of, conduct prohibited by . . . Section 43.05 (Compelling Prostitution)[.]" *See* TEX. PENAL CODE § 20A.02(a)(7)(H). To "traffic" means to "transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means." *Id.* § 20A.01(4). And "child" means "a person younger than 18 years of age." *Id.* § 20A.01(1).

**B.      Analysis**

Milton argues in his second issue that the evidence is legally insufficient to sustain his conviction under Cause No. 1612516 for compelling prostitution and trafficking of a child for compelling prostitution. Milton does not dispute there is legally sufficient evidence that Jane performed sexual acts with men in exchange for money.[14] Instead, he argues the evidence is legally insufficient "because he did not cause [Jane] to commit prostitution as required to prove [she] was the victim of compelling prostitution."[15] Appellant relies on *Turley v. State*, 597 S.W.3d 30 (Tex. App.—Houston [14th Dist.] 2020, pet. granted) to argue that because Jane was a minor at the time of the offense, she could not have consented to sex as a matter of law, and thus she could not have committed prostitution, an element of the underlying offense.

In *Turley*, the Fourteenth Court of Appeals reversed the appellant's convictions of compelling prostitution of a child and trafficking a child based on compelling prostitution based on its holding that a child under the age of fourteen cannot consent to sex as a matter of law and therefore cannot commit prostitution,

---

[14]      Indeed, there was significant testimony from Jane describing her multiple encounters with men, including the location of the encounters, how the encounters were set up, the number and nature of the encounters, what transpired during the encounters, and Jane's receipt of money in exchange for performing sexual acts with men.

[15]      Milton was also convicted in Cause Number 1612515 of trafficking of a child by causing Jane to become the victim of sexual assault. Milton does not challenge the legal sufficiency of his conviction in Cause Number 1612515.

an element of the underlying offenses. 597 S.W.3d at 43–44, 46. The appellant in *Turley* was the father of a four-year-old girl. He posted a Craigslist ad captioned "Play with Daddy's Little Girl." *Id.* at 36. He proposed a "meet up" with an undercover police officer for a sexual encounter with the child provided the officer was "generous." *Id.* After the undercover officer arrived at the appellant's apartment and saw the sleeping child wearing only a pajama top, Turley was arrested. *Id.* at 37. The jury convicted the appellant of compelling prostitution of a child younger than eighteen and of trafficking a child based on compelling prostitution. *Id.* at 36.

On appeal, Turley argued that the State's evidence was insufficient to prove he compelled prostitution of a child because the complainant was younger than fourteen and as a matter of law, the complainant could not consent to sex and commit prostitution. *Id.* He argued the State's evidence was insufficient as to the trafficking charge because he did not cause the child to become the victim of compelled prostitution. *Id.* Relying on *In re B.W.*, 313 S.W.3d 818 (Tex. 2010), the Fourteenth Court of Appeals held that "a child under the age of fourteen may not be charged with" prostitution because children under fourteen lack "the legal capacity to consent, which is necessary to find that a person 'knowingly agreed' to

engage in sexual conduct for a fee." *Turley*, 597 S.W.3d at 43–44 (citing *In re*

*B.W.*, 313 S.W.3d at 822, 824, 826).[16, 17]  The court of appeals thus concluded:

> Following the plain meaning of the compelling-prostitution statute, which requires as a necessary element a showing that another person . . . was caused to commit prostitution, when the other person is a "child" and that child cannot commit the offense of prostitution, we conclude the defendant cannot be convicted for compelling prostitution.

*Id.* at 36–37 (footnotes omitted).[18]

---

[16]  In *In re B.W.*, 313 S.W.3d 818, 824 (Tex. 2010), the Supreme Court stated, "The Legislature has determined that children thirteen and younger cannot consent to sex. This necessitates the holding that these children cannot be tried for prostitution."  The defendant in *In re B.W.* was a thirteen-year-old child who offered to engage in oral sex with an undercover police officer for twenty dollars. *Id.* at 819.  She originally was charged in criminal court but when her age was discovered, the charges were dismissed, and juvenile proceedings were filed under the Family Code.  *Id.*  The Supreme Court agreed with B.W. that the Legislature did not intend to apply the offense of prostitution to children under fourteen "because children below that age cannot legally consent to sex." *Id.* at 820.

[17]  The Court of Criminal Appeals has not ruled on the issue of consent involving minors in the context of convictions for compelling prostitution and trafficking a child based on compelling prostitution.  The Supreme Court's decision in *In re B.W.*, a juvenile civil case, was not binding in *Turley* nor is it binding on our determination of this criminal appeal.

[18]  The *Turley* court found *In re B.W.* persuasive, stating that

> regardless of any factual agreement to sex, children younger than 14 years of age cannot as a matter of law possess the requisite culpable mental state of the offense of prostitution and "cannot be tried for prostitution."  According to the *B.W.* court, the legal incapacity of children under 14 to knowingly consent to sex entirely does away with the need to consider whether any particular child under 14 may have consented to sex as a factual matter.

*Turley*, 597 S.W.3d at 43–44 (citing *In re B.W.*, 313 S.W.3d at 822–24).

Milton requests we extend the holding in *Turley* to children ages fourteen through seventeen, and hold that because Jane, who was fifteen and sixteen years old when she had sex with multiple johns at his behest, was not old enough to consent to sex as a matter of law, the State failed to prove she committed prostitution to support his conviction for the offense of trafficking of a child by compelling prostitution.[19] Milton concedes that the same court that decided *Turley* previously held that a sixteen-year-old child can commit the offense of prostitution. *See In re B.D.S.D.*, 289 S.W.3d 889, 891, 894 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (affirming adjudication that sixteen-year-old "engage[ed] in delinquent conduct by committing the offense of prostitution," observing that "the statutory definition of 'prostitution' in section 43.02 [of the Texas Penal Code] is not limited to conduct by adults" and "[u]nder the unambiguous language of [Texas Penal Code] section 43.05, a person under the age of seventeen can commit the offense of prostitution").[20]

---

[19]  A person commits prostitution "if the person knowingly offers or agrees to receive a fee from another to engage in sexual conduct." TEX. PENAL CODE § 43.02(a).

[20]  The sixteen-year-old appellant in *In re B.D.S.D.* confessed "that she had knowingly agreed to engage in sexual conduct, namely sexual intercourse, for a fee." *In re B.D.S.D.*, 289 S.W.3d 889, 891 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). She contended that she ran away to live with friends who did not know she was engaging in prostitution, which she did "for the money 'to buy things' that she wants." *Id.* at 892. She was not adjudicated "as a victim of sexual conduct." *Id.* at 895.

The State argues that *Turley* was incorrectly decided and that the Court of Criminal Appeals will likely reverse it.[21] It also argues that the plain language of the Penal Code and the Legislature's intent preclude the application of *Turley* to the present facts. Specifically, the State argues that two amendments effective in 2009, and two amendments effective in 2011, manifest a legislative intent to prosecute a person for compelling prostitution of any child without proof that the child consented to it. First, the State points to the amendment of the "compelling prostitution" statute after the decision in *B.D.S.D.*, which amended the statute to add the language: "causes by any means a child younger than 18 years to commit prostitution, regardless of whether the actor knows the age of the child at the time of the offense." *See* TEX. PENAL CODE § 43.05 (a)(2). Second, the State notes that the Legislature amended Section 43.02 to add a defense to the offense of prostitution, stating: "It is a defense to prosecution for an offense under Subsection (a) that the actor engaged in the conduct that constitutes the offense because the actor was the victim of conduct that constitutes an offense under Section 20A.02 or 43.05."[22] *See id.* § 43.02(d) (footnote added).

---

[21] The Court of Criminal Appeals granted the State's petition for discretionary review in *Turley*. The petition remains pending before the Court of Criminal Appeals as of the date of this opinion.

[22] As noted, Section 20A.02 of the Texas Penal Code addresses "Trafficking of Persons" and Section 43.05 pertains to "Compelling Prostitution."

42

Third, the State argues the Legislature added a definition of "child" as "any person younger than 18 years of age" to Section 20A.01(a) of the statute that pertains to the trafficking of persons and compelling prostitution. *See id.* § 20A.01(a). Finally, the Legislature added an offense for a person who "traffics a child" and causes the child to "engage in, or become the victim of . . . prostitution." *See id.* § 20A.02(7)(E).

We need not decide whether *Turley* was decided incorrectly, as the State advances, nor do we find *Turley* relevant to our analysis. *Turley* relied on case law addressing the ability of children younger than fourteen to consent to sex. That issue is not before us. Jane was fifteen to sixteen years old at the time of the indicted offenses and we decline Milton's invitation to extend *Turley* to hold that children between the ages of fourteen and seventeen cannot, as a matter of law, commit prostitution or be a victim of a compelling-prostitution offense.[23]

As the court explained in *In re B.W.,* the "notion that an underage child cannot legally consent to sex is of longstanding origin and derives from the common law." *See In re B.W.*, 313 S.W.3d at 820. Texas, however, "follows the majority of states which have established a two-step scheme that differentiates

---

[23]    *See also Evans v. State*, No. 06-16-00064-CR, 2017 WL 1089806, at *1, 6 (Tex. App.—Texarkana Mar. 22, 2017, pet. ref'd) (mem. op., not designated for publication) (affirming two convictions for trafficking of fifteen-year-old girl and modifying third conviction to reflect conviction for compelling prostitution).

between sex with a younger child and sexual relations with an older teen." *See id.* "Our Legislature has incorporated this rationale into the Texas Penal Code." *Id.*

By enacting Section 22.011 of the Texas Penal Code, the sexual assault statute, "the Legislature made it a crime to intentionally or knowingly have non-consensual sex with an adult, or sex under any circumstances with a child (a person under seventeen)." *See id.* at 820; *see also* TEX. PENAL CODE § 22.011. Section 22.011 provides certain affirmative defenses when the child is younger than seventeen, but older than thirteen, "such as when the accused is no more than three years older than the child, or when the accused is the child's spouse." *See In re B.W.*, 313 S.W.3d at 821 (citing TEX. PENAL CODE § 22.011(d)). In those circumstances, "the child's subjective agreement or assent becomes the main issue in determining whether or not a crime has been committed." *Id*. at 821. Thus, contrary to Milton's argument, at least under some circumstances, a child older than thirteen, but younger than eighteen, may consent to sex.

Milton responds that evidence of Jane's paid sexual encounters "did not include any of the circumstances" relevant to the affirmative defenses in Section 22.011(e). He argues there is no evidence in the record regarding the actual age of the dozens of johns with whom Jane had sex in exchange for money, and that Jane's descriptions of the men with whom she had sexual encounters "were more than three years older than her and not her spouse." These facts are

44

inconsequential. The issue is not whether there is evidence here of the affirmative defenses listed under Section 22.011(e). The point is that Section 22.011 and the permitted affirmative defenses under that section reflect our Legislature's intent to treat children older than thirteen different for purposes of consent involving sexual conduct. This refutes Milton's blanket assertion that children fourteen to seventeen years of age can never consent to sex as a matter of law.

In light of the foregoing, we hold that in the context of a conviction for compelling prostitution of a child and trafficking of a child based on compelling prostitution, a child older than thirteen years old does not, as a matter of law, lack the ability to consent to sex for purposes of committing prostitution.

### b. Sufficiency of the Evidence

The State argues that it proved Milton picked up a "15-year-old [Jane], took her to hotels, told her to post sexy pictures that resulted in 'johns' agreeing on a fee to have sex with her, and [Milton] kept the money she received from doing that." Viewing the record in the light most favorable to the verdict, the evidence reflects that as soon as Jane met Milton in person, he began to "groom" her, promising her gifts, "all the stuff that a girl wants," making her feel "spoiled." The first few days they were together, he brought Jane food and marijuana and told her he would give her money. Jane testified that she thought he was offering her a job. It was

45

"promises, promises." Milton bought her whatever she wanted, asked her every two hours whether she was hungry, was acting "cool."

But things changed. After a few days, Milton told Jane that he expected her "to do stuff with other men for money." He told her to take sexy photos wearing revealing clothes and to post the photos in ads on adult websites. The ads, which lied about Jane's age, resulted in agreements for her to have sex with men, whose money Milton kept.

From September 19, 2018 until November 7, 2018, Jane was sexually assaulted by approximately sixty different men in seven different hotels,[24] all of whom paid for sex acts, and some of whom were aggressive. Sometimes, Jane was assaulted by as many as seven or eight men in a single day. And on one of those days, Milton assaulted Jane. According to Jane, Milton did not let her sleep and forced her to take drugs to stay up. If she did not make money for him, he did not feed her.

Approximately six weeks after she met Milton, he told Jane to recruit additional girls so he could make more money. Jane got on the SKOUT app and met Marcy, telling her she could get her nails done and get money for food and clothes if she went with Jane. Jane and Milton picked up Marcy and went to a

---

[24] In the sixth hotel, where they stayed a single night, Milton "gave" Jane to Baham. Jane was at the seventh hotel one night before she was recovered. Jane was in hotels with Milton approximately seven weeks.

hotel where Marcy, who was thirteen years old, put on lingerie and posed for photos. Jane posted the photos on a sex advertising site and a man came to the hotel and paid to have sex with Marcy that night.

Jane did not have a driver's license or a car and, therefore, had no way to get home from the hotels to which Milton took her. Even when she had access to a phone, she knew Milton would check the phone later to monitor her calls. In any event, she did not want to call her family because she was concerned for their safety, embarrassed, did not want her family to be disappointed in her, and felt like they were better off without her. Jane testified she was relieved when the police found her.

We find the jury could reasonably have determined the evidence was sufficient to establish Milton compelled prostitution of a child and trafficked a child by compelling prostitution. *See, e.g., Waggoner v. State*, 897 S.W.2d 510, 512–13 (Tex. App.—Austin 1995, no pet.) (holding evidence sufficient to support jury's finding that defendant who provided contact and meeting, negotiated price, provided condom and cell phone, drove minor to location, and persuaded minor to "go through with the encounter" knowingly caused minor to commit prostitution); *Menyweather v. State*, No. 05-13-01108-CR, 2014 WL 6450826, at *5 (Tex. App.—Dallas Nov. 18, 2014, no pet.) (mem. op., not designated for publication) (holding evidence that defendant posted internet ads for customers to contact

47

minor, transported minor to locations to have sex, accepted money from minor that she was given for sex, used money to pay for hotels and items for minor, and behaved abusively toward minor if she did not act appropriately toward him was sufficient to support conviction for compelling prostitution); *Quillens v. State*, No. 01-18-00056-CR, 2018 WL 4701580, at *4 (Tex. App.—Houston [1st Dist.] Oct. 2, 2018, no pet.) (mem. op., not designated for publication) (holding evidence was sufficient to support conviction for compelling prostitution where defendant posted minor's ad on website used by traffickers, arranged transportation to take minor to "out-call," waited while minor had sex, and then took her to hotel).

We overrule Milton's second issue.

## Evidence of Extraneous Offenses

In his third issue, Milton argues the trial court abused its discretion in admitting extraneous offense testimony regarding his alleged trafficking of a thirteen-year-old child (Marcy) based on compelling prostitution because the evidence was not sufficient for a reasonable juror to find he committed the offense beyond a reasonable doubt as required by Article 38.37 of the Texas Code of Criminal Procedure.

### A. Standard of Review and Applicable Law

We review a trial court's ruling on the admission of evidence for abuse of discretion. *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). This

standard of review applies to a trial court's decision to admit evidence of extraneous offenses. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *Id.*

An extraneous offense is "any act of misconduct, whether resulting in prosecution or not, which is not shown in the charging instrument and which was shown to have been committed by the accused." *Martinez v. State*, 190 S.W.3d 254, 262 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (quoting *Worley v. State*, 870 S.W.2d 620, 622 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd)). Because an accused must be tried only for the offense for which he is charged and may not be tried for a collateral crime, extraneous offense evidence is usually not admissible to prove "a person's character or character trait" in order "to prove that on a particular occasion the person acted in accordance with the character or trait." TEX. R. EVID. 404(a)(1). But in prosecution of crimes against children, including trafficking, Article 38.37 of the Texas Code of Criminal Procedure provides that the State may, notwithstanding Texas Rules of Evidence 404[25] and 405,[26] introduce

---

[25] Rule 404 allows the admission of "Crimes, Wrongs, or Other Acts" of an accused to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b). Such evidence is not admissible "to prove a person's character in order to show that on a particular

evidence at trial "that the defendant has committed a separate offense[.]" TEX. CODE CRIM. PROC. art. 38.37, §§ 2(a)(1)(A), 2(b). Specifically, Article 38.37 allows the admission of evidence concerning certain enumerated offenses, including sexual assault or trafficking of a child other than the complainant, when the defendant is on trial for sex trafficking the child complainant under Texas Penal Code Section 20A.02. *See Belcher v. State*, 474 S.W.3d 840, 844 (Tex. App.—Tyler 2015, no pet.) (holding that in trial of defendant for certain sexual crimes against children, Article 38.37 allows admission of certain enumerated offenses previously committed by defendant against non-complainant); *Buxton v. State*, 526 S.W.3d 666, 689 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (affirming trial court's admission of evidence pursuant to Article 38.37 that defendant committed extraneous bad acts against complainant's sister); *Fahrni v. State*, 473 S.W.3d 486, 491 (Tex. App.—Texarkana 2015, pet. ref'd) (noting that evidence of certain extraneous offenses committed by defendant against non-complainant child is admissible under Article 38.37). The evidence is admissible "for any bearing the evidence has on relevant matters, including the character of

occasion the person acted in accordance with the character." TEX. R. EVID. 404(a).

26   Rule 405 states in pertinent part, "When a person's character or character trait is an essential element of a charge, claim, or defense, the character trait may also be proved by relevant specific instances of the person's conduct." TEX. R. EVID. 405(b).

the defendant and acts performed in conformity with the character of the defendant." TEX. CODE CRIM. PROC. art. 38.37, § 2(b).

If the decision to admit evidence is supported by the record, there can be no abuse of discretion and the trial court's ruling will not be reversed. *Marsh v. State*, 343 S.W.3d 475, 478 (Tex. App.—Texarkana 2011, pet. ref'd) (citing *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002)). The reviewing court will not substitute its own decision for that of the trial court. *Marsh*, 343 S.W.3d at 478 (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)).

Before evidence of a separate offense against a person other than the complainant may be admitted, the trial court must first conduct "a hearing outside the jury's presence [and conclude] that the evidence likely to be admitted will be adequate to support a jury finding that the defendant committed the separate offense beyond a reasonable doubt." *Castillo v. State*, 573 S.W.3d 869, 880 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) (citing TEX. CODE CRIM. PROC. art. 38.37, §§ 2(b), 2-a). "The defendant need not have been charged with, tried for, or convicted" of the separate offense for the evidence to be admissible. *Id.* at 880–81 (noting that "Texas appellate courts have affirmed the admission of or reliance on evidence that the defendant committed a separate sexual offense against another child under article [38.37] despite the dismissal of charges concerning those separate offenses"); *see also Wishert v. State*, 654 S.W.3d 317, 331 (Tex. App.—

51

Eastland 2022, pet. ref'd) ("For this type of [extraneous] evidence to be admissible under Article 38.37, Section 2(b), the defendant need not have been charged with, tried for, or convicted of the separate offense.").

## B. The Article 38.37 Hearing

Prior to and during trial, the trial court conducted an Article 38.37 hearing outside the presence of the jury to consider evidence of extraneous offenses involving Milton's alleged trafficking and compelling of prostitution and sexual assault of Marcy. *See* TEX. CODE CRIM. PROC. art. 38.37, § 2-a(2). After the trial court ruled evidence of the extraneous offenses was admissible, the court granted defense counsel's request for a running objection to any testimony from Jane or Marcy about the extraneous offenses.

Only Marcy testified during the first portion of the Article 38.37 hearing. Marcy was seventeen years old when she testified. She testified that in October 2018, she was thirteen years old and in eighth grade. That month, Marcy met a girl on "MeetMe," a social app. They introduced themselves to each other and they decided to meet on Halloween 2018. Marcy did not know the other girl's true name, but she later identified her as Jane.

When Jane came to pick up Marcy, there was a man in the front seat and Marcy got into the back seat of the car. Jane told Marcy the man was her friend. They drove to the InTown Suites in Greenspoint and went into a hotel room. "I

remember him leaving and it was just me and the girl and she gave me . . . lingerie to try on and . . . take pictures in it." Marcy identified Milton in the courtroom as the man who was with Jane when they picked her up. Marcy and Jane spent the night in the Intown Suites. Marcy did not see Milton again that night but believed he paid for the hotel room.

After they took the photos, Jane uploaded them onto some "sex ads" and "sex Websites," "where people . . . pay to have sex with you." After the photos were posted, a man came to the hotel, Jane left the room, and Marcy and the man who came to the hotel had sex. "I got the money and then I gave it to [Jane]." She does not know the name of the man with whom she had sex. "[H]e came to see me because he wanted to have sex and he paid for it, I guess." Jane told Marcy what to charge him and after he paid, she gave Jane the money. The next morning, Calloway came to get Marcy and Jane. He dropped Jane off at another hotel and Marcy at her middle school.

Milton argued Marcy's testimony was "insufficient for a jury to be able to find a guilty verdict beyond a reasonable doubt" because they did not know the identity of the man who picked up Marcy from the hotel in the morning. In addition, he argued there was no testimony that Milton received money or identifying whose phone was used to take photos. He argued all the clothes given to Marcy were given to Marcy by Jane. He stated, "The other female [Jane] is the

53

female that made contact with her. The other female was the one that participated or assisted her in any way, shape, and form in the room." Milton argued there was no evidence reflecting who paid for the hotel room, and he noted that Milton did not pick Marcy up from the hotel room in the morning or take her to school.

Milton also argued that, under *Turley*, he could not have trafficked or compelled the prostitution of Marcy because she was only thirteen years old at the time of the alleged offense. Given her age, Milton argued Marcy was not able to consent to sex, as a matter of law, and thus she was unable to commit the offense of prostitution.

The State argued that under Article 38.37, evidence that Milton committed a separate offense was admissible "for any bearing the evidence ha[d] on relevant matters including [his] character . . . and acts performed in conformity with [such] character." The State argued that was "exactly what [Marcy] testified to." That is, Marcy testified that Milton took her to a hotel where she was "caused to commit . . . an act of prostitution." The information Marcy testified to "goes to [Milton's] propensity to traffic children, which is what he's on trial for in this case. It also could go to his intent or his plan." The State explained that the dates about which Marcy testified corresponded with the times Jane was with Milton. The State argued the evidence was adequate to support a finding that Milton "committed a

separate offense beyond a reasonable doubt and goes to his character as well as acts performed in conformity with his character."

The trial court found that Marcy's testimony was credible but "there was nothing in her testimony regarding statements made by Mr. Milton, actions taken by Mr. Milton outside of him driving to the hotel." The court held that while the State's evidence was credible, "a jury would not find beyond a reasonable doubt that Mr. Milton had committed the offense that the State is alleging regarding [Marcy.]" The court sustained Milton's objections to Marcy's testimony under 38.37. The court noted, however, that it could reconsider the ruling after hearing additional testimony during trial.

The Article 38.37 hearing reconvened on the third day of trial. During the second portion of the 38.37 hearing, Jane testified that Milton wanted her to start recruiting other girls. She stated he wanted her to "find other girls that were willing to do the same thing that I was doing, which was sleeping with men for money." He expected her to do that by texting them. "[H]e felt if I was a girl texting another girl about what was going on, he believed that girl would be more comfortable coming with me; but, in reality, the girl was for him."

Jane testified that she went along with Milton's directive to recruit others. "I just did it. Because at that point, I just looked at him like a boss. Like, he made the money I was making. He was the one feeding me. He was the one, like, telling

me that he was going to give me this and that. So I didn't want to do nothing to make him upset because I felt like at that point I wasn't going to get at least food or anything." She testified she was worried about Milton getting upset with her because he had guns around.

During her stay at the third hotel, Milton gave Jane a phone to use to text girls and to "find another girl to make more money." She was to use the same SKOUT app. "When I texted girls, I said the same thing that he told me, which was that they'd get clothes, nails, anything they wanted done, they would get money. I didn't state what it was, but I would tell them that." Marcy responded to Jane's texts. "She looked grown" in her profile photo and her profile said she was nineteen. Jane "assumed that she was 19 and then I told [Milton] about it and I told him I found a girl and she's willing to do it. . . . " Milton told her the girl could keep half of the money she made, and he would keep the other half.

The next day, Jane and Milton went to get Marcy at her home "and then I texted her to come out. When she come out, I could tell that she was a little girl." Jane could tell Marcy was young because Jane had to call the girl's mom to tell her where she was. After Jane spoke to the girl's mom, Milton took them back to the third hotel. Milton paid for the hotel. "[T]he whole reason why he brought that girl there in the first place was to make more money. So it–it wasn't sitting right with me, because I know her profile said that she was 19; but after calling her mom

and then just looking at her, I was, like, you're young. I can tell you're young. And I felt bad. I felt really bad."

Milton left Jane with Marcy at the hotel. "So my whole instinct was just to finish what I started and just get her back home." She just wanted to take photos of both of them, as he told her to do, "because he was trying to see if maybe both of us together could make some more money. . . ." She did not recall whether she posted the photos or sent them to Milton to post.

Jane identified the photos she took of the girl on November 1, 2018. Marcy had one sex date after the photos were posted. A lot of guys were texting after the photos were posted but Jane put the phone on silent mode. "I turned the ringer off because I didn't want to be with nobody. I didn't want her to be with nobody, and then I just wanted to go to sleep." Jane and Marcy both fell asleep. Milton came back "because I wasn't answering the phone calls." "I [had] silenced the phone. And I guess while the phone was silenced and I was sleeping, he was calling me; and I didn't hear those calls, so he came to the hotel." Milton and his friend started "going off that why am I sleeping, I'm missing out money, and that I always do this shit . . . that I always go to sleep when I should be making money."

Early in the morning, a man came over to have sex with Marcy. Jane testified she "was outside the room. So I was right there." Her understanding in communicating with the man was that there would be a sex act for money. The

57

man paid $70 to be with Marcy. Jane gave $35 to Marcy and $35 to Calloway, because Milton was unavailable. Calloway and another girl picked up Jane and Marcy from the hotel and dropped Marcy off either at school or at her apartment. Jane did not see Marcy again after that. Jane was the one who communicated with Marcy, took the photos, and obtained the payment.

After the second Article 38.37 hearing, the trial court allowed the admission of Marcy's testimony. The defense was granted a running objection to any testimony from Jane about Marcy and a running objection to Marcy's testimony itself.

## C. Analysis

Milton argued in the trial court that Marcy's testimony should be excluded because given the holding in *Turley*, Marcy was not able to commit the offense of prostitution as a matter of law. On appeal, he argues that Marcy could not have become the victim of compelling prostitution "due to her incapacity to consent to sexual conduct, i.e., conduct prohibited by Section 43.05." Moreover, he argues, "[t]he testimony of a child who experienced prostitution at thirteen years of age was emotionally strong, and detracted [sic] the jury's consideration as to whether [Milton] trafficked [Jane] by aiding her prostitution." He claims Marcy's testimony "had a substantial and injurious influence on the jury, therefore, his right to a fair trial was violated."

58

We need not decide whether Marcy could have legally consented to sex for purposes of our analysis because as the State points out, the State gave Milton notice under Article 38.37 that it would be alleging not only that Milton caused Marcy to engage in or become the victim of prostitution, but also that Milton caused Marcy to engage in or become the victim of sexual assault under Section 22.011 of the Texas Penal Code.[27]

The State explained that the pretrial extraneous-offense notice it served on Milton alleged that Milton "knowingly transport[ed] [Marcy], a person younger than eighteen years of age . . . and did cause [Marcy] to become the victim of conduct prohibited by Section 22.011 of the Texas Penal Code."[28] The State noted that (1) Jane testified she assisted in recruiting Marcy and that Marcy was trafficked when she was taken to a hotel where she had sex with a man for money, and (2) transporting by driving plus a sexual assault is trafficking. The State asserted that an extraneous offense admitted under Article 38.37 does not have to match the offense for which the defendant is on trial.

In objecting to the admission of the extraneous offense evidence, Milton relied exclusively on *Turley*. He argued that the admission of the extraneous

---

[27]    Under Article 38.77, Section 3 the "state shall give the defendant notice of the state's intent to introduce in the case in chief evidence described by Section 1 or 2 not later than the 30th day before the date of the defendant's trial." TEX. CODE CRIM. PROC. art. 38.37, § 3. Milton does not dispute he received notice from the State as required under Article 38.37, Section 3.

[28]    Section 22.011 of the Texas Penal Code pertains to sexual assault.

59

offense evidence involving Marcy would "conflict[] with *Turley* and is—and would be confusing, misleading, and under [Texas Rule of Evidence] 403, I feel, I guess—well, absent a [Rule] 403[29] analysis and [an Article] 38.37, that Defense— that defendant would be harmed materially by that." On appeal, he similarly argues that Marcy's testimony was inadmissible because she

> did not become the victim of compelling prostitution due to her incapacity to consent to sexual conduct, i.e., conduct prohibited by Section 43.05. Appellant could not commit the offense of compelling prostitution as a matter of law, and because the evidence did not support a conclusion that he did compel [Marcy] to commit prostitution, he also could not commit the offense of trafficking of a person.

Milton does not address the State's argument that the extraneous offense evidence was also offered to establish that he trafficked Marcy by causing her to become the victim of sexual assault under Section 22.011 of the Texas Penal Code.

We conclude the evidence concerning the extraneous offense satisfied the criteria for admissibility under Article 38.37, and thus the trial court did not abuse its discretion in admitting the extraneous offense evidence. The decision in *Ritz v. State*, 481 S.W.3d 383 (Tex. App.—Austin 2015, pet. dism'd) is instructive. In

---

[29] Texas Rule of Evidence 403 states the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401.

*Ritz*, the 44-year-old defendant ("Ritz") met a 14-year-old girl on an online dating site. *Id.* at 384. At first, Ritz and the girl had sex in his car or outside on a blanket. *Id.* Later he picked the girl up near her home, drove her to his home, had sex with her there, and dropped her off near her home. *Id.* Citing Sections 20A02.(a)(7) and 22.011 of the Penal Code, the court of appeals held, "if Ritz transported [the girl] and caused her to become the victim of . . . sexual assault, then he committed trafficking of persons[.]" *Id.* at 385. The court continued, "[v]iewing this evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found that Ritz transported [the girl] by driving her to his home and back, [and] that Ritz caused [the girl] to become the victim of conduct enumerated in section 20A.02(a)(7) by engaging in sexual activities with her, including intercourse[.]" *Id.*

Similarly here, the evidence shows that Milton transported Marcy by picking her up at a friend's home and taking her to a hotel, where he caused her to become the victim of a sexual assault. Marcy testified that Milton and Jane drove her to a hotel where Jane dressed her up and took pictures. Her pictures were then posted in a sex ad. Marcy testified that a man in his "late 30's" responded to the ad, came to the hotel, and penetrated her vagina with his penis. An adult engaging in sexual intercourse with a thirteen-year-old is a criminal act. *See* TEX. PENAL CODE

61

§22.011(a)(2)(A) (stating person commits offense if person causes penetration of child's anus or sexual organ by any means).

Although Milton did not lodge a formal Rule 403 objection to Marcy's testimony, he did make a running objection to Marcy's testimony during trial. While it is less than clear that the running objection was lodged under Rule 403, we liberally construe his running objection as an objection under Rule 403. The Waco Court of Appeals recently addressed the relationship between Article 38.37 and Rule 403:

> The admission of evidence pursuant to Article 38.37, Section 2(b) is limited by Rule 403's balancing test, which permits admission of evidence as long as its probative value is not substantially outweighed by its potential for unfair prejudice. Even so, Rule 403 "should be used sparingly to exclude relevant, otherwise admissible evidence that might bear on the credibility of either the defendant or complainant in such 'he said, she said' cases." Because evidence of separate sexual offenses is "probative on the issues of intent and a defendant's character or propensity to commit sexual assaults on children" if sufficient evidence is provided regarding the extraneous offense, the probative value of sexual offenses committed against other children is generally not substantially outweighed by the "danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

*Deggs v. State*, 646 S.W.3d 916, 925 (Tex. App.—Waco 2022, pet. ref'd) (internal citations omitted).

In conducting a Rule 403 balancing test, the trial court must consider the following non-exclusive factors:

(1) how probative the evidence is, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence.

*Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019). The factors "may well blend together in practice." *Gigliobianco v. State*, 210 S.W.3d 637, 642 (Tex. Crim. App. 2006). Upon our review, we find the Rule 403 factors support the admission of Marcy's testimony.

Under the first factor, "'probative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Id.* at 641. Marcy's and Jane's testimony regarding the recruitment and sexual assault of Marcy at Milton's instruction is probative of Milton's character or propensity to commit trafficking of children. Accordingly, it favors admission.

The second factor addresses the potential of the extraneous offense evidence to impress the jury in some irrational, but indelible way. The trial court included an instruction in the jury charge concerning the extraneous offense:

You are . . . instructed that if there is any evidence before you in this case regarding the defendant's committing an alleged offense or offenses other than the offense alleged against him in the indictment of this case, you cannot consider any evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committing such other offense or offenses, if any, and even then you may only consider the same in determining the motive, opportunity,

63

intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, in any, in connection with the offense, if any, alleged against him in the indictment and for no other purpose.

In our review, "we generally presume the jury follow[ed] the trial court's instructions in the manner presented." *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *cf. Ryder v. State*, 581 S.W.3d 439, 453 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (holding limiting instruction minimized any "impermissible inference of character conformity") (citing *Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996)); *Flores-Castro v. State*, No. 12-16-00334-CR, 2017 WL 4675367, at *5 (Tex. App.—Tyler Aug. 23, 2017, pet. ref'd) (mem. op., not designated for publication) (noting limiting instruction in jury charge "somewhat counterbalances the danger of unfair prejudice") (citing *Newton v. State*, 301 S.W.3d 315, 320 (Tex. App.–Waco 2009, pet. ref'd)). Thus, the second factor weighs in favor of admission.

Insofar as the third factor is concerned, Marcy's testimony did not consume an inordinate amount of time or repeat evidence that already had been admitted during trial. Her trial testimony spanned approximately twenty-nine pages of the reporter's record, which comprised more than 600 pages. *See Deggs*, 646 S.W.3d at 927. This factor weighs in favor of admission.

The fourth factor pertains to the State's need for the evidence. Although the admitted ads provided some physical evidence supporting the charges against

Milton, Jane was not physically injured by the assaults and her veracity and consent were at issue.[30, 31] Indeed, in his cross-examination of Jane, Milton's counsel reminded jurors that Jane had previously run away, that she provided a fake age, email, and name when she went on SKOUT, that she left home to meet Milton with no way for anyone to find her, and that she smoked marijuana about once a week when she met Milton. Milton's counsel elicited testimony that sometimes Jane posted the pictures for her ads, that she did not run away when she was left alone in the hotel room, and that she could have contacted her father but was too embarrassed and ashamed. Jane also testified in response to defense counsel's questions that she made contact with Marcy, asked her if she wanted to make money, gave her clothes, took photos of her, posted photos, gave her a condom, "assisted her in getting a john," and hung around the hotel unsupervised while Marcy had sex with a john. In light of this testimony, we find the trial court reasonably could have determined the State's need for the evidence favored admission of Marcy's testimony regarding the extraneous offense.

We conclude the probative value of the extraneous offense testimony was not substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID.

---

[30] There was evidence Jane had contracted chlamydia.

[31] *See Newton v. State*, 301 S.W.3d 315, 320 (Tex. App.—Waco 2009, pet. ref'd) (holding State's need for extraneous-offense evidence was "considerable" when there were no eyewitnesses and "no physical evidence available to corroborate the complainant's testimony").

403. We hold the trial court did not abuse its discretion in admitting the testimony. We overrule Milton's third issue.

## Reforming the Judgment

Milton asserts in his first issue that the trial court's final judgments in Cause Number 1612515 and Cause Number 1612516 should be reformed with respect to the first enhancement paragraph and the concurrent nature of the sentences. In their current form, the judgments state with respect to the first enhancement paragraph that Milton "pleaded true" and the finding was "found true." And rather than indicating that the sentences are to run concurrently, as the trial court ordered, the judgments state "N/A." Milton argues that the finding on the first enhancement paragraph should be reformed to state "N/A" instead of "pleaded true" and "found true," and that the judgments should be modified to indicate the sentences are to run concurrently, rather than "N/A."

The State concedes the final judgments are incorrect and should be reformed as Milton requests. The State also requests, however, that the final judgments be revised to indicate that Milton "is required to register as a sex offender in accordance with Chapter 62, Tex. Code Crim. Proc." and that "[t]he age of [the] victim at the time of the offense was 15 year[]s old." [32] The judgments currently reflect that Milton is not required to register as a sex offender, and with respect to

---

[32] Milton did not file a reply brief responding to the State's request for this modification.

the complainant's age, the judgments state, "N/A."

The State argues that Milton was convicted of (1) trafficking a child by compelling prostitution and (2) trafficking of a child by causing the child to become the victim of sexual abuse, both of which "are subject to Chapter 62 of the Texas Code of Criminal Procedure." *See* TEX. CODE CRIM. PROC. art. 62.001(5)(K); TEX. PENAL CODE §§ 20A.02(a)(7)(H), (a)(7)(C). Article 62.002(a) of the Texas Code of Criminal Procedure provides that the sex offender registration statute applies to certain "reportable conviction[s] or adjudication[s]." A "reportable conviction or adjudication" means a conviction or adjudication for, among other things, trafficking of persons. TEX. CODE CRIM. PROC. art. 62.001(5)(K). A defendant with a "reportable conviction" is required to register as a sex offender. *Id.* art. 62.051(a); *Crabtree v. State*, 389 S.W.3d 820, 825 (Tex. Crim. App. 2012). "When a person is convicted of an offense for which registration for a sex offense is required under chapter 62, the judgment must include (1) a statement that the registration requirements of that chapter apply to the defendant and (2) a statement of the age of the victim." *Palmer v. State*, No. 05-19-01135-CR, 2021 WL 1049870, at *8 (Tex. App.—Dallas Mar. 19, 2021, no pet.) (mem. op., not designated for publication); TEX. CODE CRIM. PROC. art. 42.01 § 1(27).

"An appellate court has the power to correct and reform a trial court judgment 'to make the record speak the truth when it has the necessary data and information to do so. . . .'" *Tyler v. State*, 137 S.W.3d 261, 267–68 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (quoting *Nolan v. State*, 39 S.W.3d 697, 698 (Tex. App.—Houston [1st Dist.] 2001, no pet.)); *see also Shumate v. State*, 649 S.W.3d 240, 244 (Tex. App.—Dallas 2021, no pet.) ("An appellate court has the authority to modify an incorrect judgment to make the record speak the truth when it has the necessary information to do so.") (citing TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993)); *Lourenco v. State*, No. 05–13–01092–CR, 2015 WL 356429, at *10 (Tex. App.—Dallas Jan. 28, 2015, no pet.) (mem. op., not designated for publication) (modifying judgments to reflect applicability of sex offender registration requirements and age of victim). We note that even though the State did not assert a cross-point on appeal with respect to the sex-offender registration, we have the authority to modify incorrect judgments sua sponte when we have sufficient information. *See Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd) ("The authority of an appellate court to reform incorrect judgments is not dependent upon the request of any party, nor does it turn on the question of whether a party has or has not objected in the trial court.").

We agree with Milton that the judgments should be reformed with respect to the first enhancement paragraphs and the concurrent nature of the sentences. We modify the judgments to reflect a finding on the enhancement paragraphs of "N/A" instead of "pleaded true" and "found true," and to state that the sentences are to run concurrently. In addition, given our holding that the evidence is sufficient to support the convictions in the challenged case, we modify the judgments on our own motion to reflect that the sex offender registration requirements of Chapter 62 apply, and that the victim was fifteen years old at the time of the offense. *See Zamarron v. State*, No. 05-19-00632-CR, 2020 WL 6280869, at *5 (Tex. App.—Dallas Oct. 27, 2020, pet. ref'd) (mem. op., not designated for publication) (sua sponte modifying judgment to indicate defendant was required to register as sex offender); *Ruiz v. State*, No. 05-12-01703-CR, 2014 WL 2993820, at *12 (Tex. App.—Dallas June 30, 2014, no pet.) (mem. op., not designated for publication) (same).

We sustain Milton's first issue.

## Conclusion

We affirm the trial court's judgments, as reformed.

                                        Veronica Rivas-Molloy
                                        Justice

Panel consists of Justices Goodman, Rivas-Molloy, and Guerra.

Publish. TEX. R. APP. P. 47.2(b).